IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 20, 2008 Session

## STATE OF TENNESSEE v. JULIE ANN TAYLOR BUCHANAN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2005-C-1875      Mark J. Fishburn, Judge**

_____

**No. M2007-00506-CCA-R3-CD - Filed October 2, 2008**

_____

The defendant, Julie Ann Taylor Buchanan, entered an open plea to one count of theft of property over $60,000 (Class B felony), one count of theft of property between $1000 and $10,000 (Class D felony), one count of forgery over $60,000 (Class B felony), two counts of forgery between $1000 and $10,000 (Class B felony), and four counts of money laundering (Class B felony), with all the crimes occurring between December 2000 and April 2003. Following a sentencing hearing, she was sentenced to eleven years on each Class B felony and four years on each Class D felony. The sentences were ordered to be served concurrently to each other except for the four-year sentence for the Class D felony theft, which was to be served consecutive to the other eight sentences, for a total effective sentence of fifteen years in the Tennessee Department of Correction. On appeal, the defendant argues that the trial court erred in three areas: (1) enhancing her sentence based on facts neither admitted nor proven to a jury; (2) imposing consecutive sentences; and (3) application of mitigating factors. After careful review, the case is remanded for re-sentencing based upon the erroneous application of application factors in violation of *Blakely*.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Reversed in Part and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., and DAVID G. HAYES SR. J., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Julie Ann Taylor Buchanan.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Jim Milam and William Bright, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

During the guilty plea hearing, the State recited the following facts which would have been presented at trial:

The proof would show that in April of 2003, . . . an officer at National Bank of Commerce at the Brentwood branch, made a phone call to . . . the principal of Granbery Elementary School, and informed her that there was a problem with some of the Granbery School accounts. [The principal], not being aware of what accounts were at the bank, inquired and was informed that there were four separate accounts for the Granbery PTA at National Bank of Commerce and that [the defendant] was the person who maintained those accounts and had signing authority on all of the accounts. The bank had flagged the accounts because of improper deposits and withdrawals from the accounts and activity between the different accounts, that lead to an investigation, which resulted in [the defendant] being immediately terminated from her role with the Granbery PTA and being asked to turn over all records to [the principal] and to auditors for the Metro Schools.

On April, the week of April 13th, 2003, [the defendant] did turn over some records to [the principal] and other officers of the Granbery PTA. An investigation followed in which it was determined that none of the officers with the PTA had any knowledge of [the defendant's] activities. Those activities included maintaining six different bank accounts at different - - at various times in the name of the Granbery School PTA; those accounts included one at the Bank of America, account number 490014209, which was closed during the period of the indictment. And then, other accounts being opened at National Bank of Commerce, those including accounts 9094012, 9094020, 9094038, 3686698, and one last account at First Tennessee Bank, 100516184.

From the work done by Metro School officials, . . . the matter was referred on to the comptroller's office for an audit. [A]n accountant with the comptroller's office[ ] proceeded to do a lengthy audit, which included interviews performed by investigators with the comptrollers office. . . . From that work, it was determined that [the defendant] admitted in one of the interviews that she had diverted between 75 and a thousand dollars by her own estimate from the Granbery accounts to herself. This occurred through a series of transactions in which she would write checks - - well, she would make deposits of funds that were intended for Granbery into her own account or conversely she would write checks from the Granbery accounts to herself and deposit the money into one of her own accounts, and then subsequently she would transfer funds back from her own account into the Granbery accounts.

After the investigation was complete, it was determined that from December of 2000 until April 11th of 2003, [the defendant] had deposited into her own accounts $313,711.45 and had transferred back from her personal accounts to the Granbery

accounts $165,207.76, leaving an approximate differential of $148,000 in money that was stolen from Granbery and never repaid.

Now, as far as the funds that were taken, these funds were raised through a variety of activities at Granbery School, it included the sale of Kroger cards and Kroger certificates to parents and patrons of the school to support PTA activities. It included the sale of wrapping paper through Innisbrook Wraps, a North Carolina company for which [the defendant] was a personal representative. It also included a sale - - I'm sorry, it included a purchase of an Apple - - from Apple Computers of computers from the school, which the PTA was supposed to pay one-half of the purchase price, but which investigation showed that the amount was never paid by the PTA because [the defendant] had diverted the money. And it also included the failure to make payment to Interstate Studios for services in the preparation of the school yearbook, that money was later repaid to Interstate by the school through a later regime of the PTA.

Now turning to the individual accounts, as to count 1, which charges theft of over $60,000 from the Granbery School PTA, the proof would show that [the defendant] was engaged in this activity from December 1st of 2000 until April 11th of 2003. All these activities connected to this indictment occurred in Davidson County, by the way, Granbery Elementary is located on Hill Road here in Davidson County, and most of the activity occurred either there or at [the defendant's] home at the time which was on Potomac Lane, also in Davidson County.

As to count 1, as I've already stated, the proof showed there was approximately $148,000, which was taken unlawfully from the PTA.

As to count two, the count of forgery over $60,000, the State's investigation indicated, and this was through interviews with witnesses, . . . that there were 109 checks on which signatories' names were forged by [the defendant]. The predominant name forged on those checks was Ann McKinney, but Patricia Pfeifer's name was also forged on at least one check, and those checks totaled over $60,000 between December 1st of 2000 and May 10th of 2002.

As to count three, there was a check number 1006 drawn on the NBC account 9094020 on December 6th, 2002. This check was in the amount between $1,000 and $10,000, and it - - or would appear to be the signature of Patricia Pfeifer, but that signature had been forged by the defendant.

As to count four, on or about November 26th, 2002, the State's proof would show through Lori Donahue and Sandra Cannon and also Regina Campbell of Apple Computers in Austin, Texas, that [the defendant] provided a copy of canceled check number 5340, which was drawn on the Bank of America account 4900142409 of the

Granbery School PTA. This check was in the amount of $9,016, and what actually happened was the copy of the canceled check had had the payee altered to make it appear that Apple Computers had received the money when in fact this check had been deposited by [the defendant] into another account and had never made it to Apple.

As to counts 5 through 8, they all involve money laundering, which I will get to in a moment.

Count 9 involved thefts of funds, which were raised by the school, by the school community, the PTA primarily, for the care and support of . . . , a child who was diagnosed with Leukemia and who was receiving cancer treatments at the time that he was a student at Granbery Elementary. [The defendant] had volunteered to the child's father to assist him in helping with the money that was being raised, and proof would show that she was - - well, that she had deposited between $1,000 and $10,000 that was raised for [the child] and deposited that money into one of her own personal accounts. This of course was done without the knowledge or authority or consent of the child's father.

The money laundering counts in counts 5 through 8; in count 5, the defendant is charged with transferring funds from Granbery's general account at Bank of America into a separate account at National Bank of Commerce and then taking that money and moving it into two of her own personal accounts. The proof from the bank records would show that on April 22nd, 2002, she deposited a $9,015 check from the Bank of America account into the Granbery PTA account 3686698 at National Bank of Commerce. And then, within a day of - - within three days of that date, she withdrew from that same National Bank of Commerce account $1,830 made payable to herself in check 1171, and also $3,621 made payable to herself in check number 1106, and also $3,750 made payable to herself in check number 1110, all from that same NBC account 3686698. And the State could contend and prove through its witnesses that these transfers were made in order to conceal the source of the funds that was deposited into [the defendant's] personal account.

As to count 6, the same type of thing occurred on January 15th, 2002, when the proof would show that there was a transfer of funds directed by [the defendant] in the amount of $14,728 from the Bank of America PTA account into the National Bank of Commerce PTA account 3686698, and that - - that check actually was made payable to Innisbrook Wraps, but of course it never made it to Innisbrook Wraps, instead going into another PTA account. Within days of that particular transfer, [the defendant] caused a check to be written withdrawing $8,500 from the NBC account 3686698 and paid into her own account. Also, a check for $2,250 from the 6698 account at NBC into her own personal account.

As to count 7, which is another money laundering account (sic), the proof there would show that [the defendant] on the - - the first week of February 2003, that there were a series of checks which . . . had been collected and made payable to the Tyler Doughty fund, these checks totaling $1,562.28, but they were not deposited by [the defendant] into the Tyler Doughty fund, instead they were deposited into an account at NBC, number 9094020, called the Granbery School Recycling account, which [the defendant] had set up and on which she was the only signatory. This account - - I'm sorry, this deposit included checks from a Mr. Funk, a Mr. Syler (phonetic), a Mr. O'Brien (phonetic), a Kroger check for $842.28, and a Mr. Park, all these checks being for the benefit of the Tyler Doughty fund. Within five days of making this deposit, [the defendant] withdrew from this same account, 9094020, $1,525, and paid it to herself, deposited into her account, 9094574.

And as to count 8, money laundering, the State's proof would show on March 25th of 2003, again, there was a transfer of - - I'm sorry, it was a deposit of $3,575 into the Granbery School Recycling account, that same account, 9094020. This deposit was made up of checks that were made to the Tyler Doughty Fund by [seven names redacted] and various other individuals who were contributing to the Tyler Doughty Fund, that deposit was put into the Granbery Recycling account by [the defendant]. Within days of making that deposit, proof would show that she had transferred an equivalent sum of money into her personal accounts out of the National Bank of Commerce account, 9094020.

That is basically the outline of the evidence that the State would present if this matter had proceeded to trial.

A sentencing hearing was held on February 16, 2007. During the hearing, an employee of Interstate Studio testified that he worked for the company that produced yearbooks for Granbery School. He testified that the defendant sent him a facsimile of fake checks purporting to have been issued for payment of the yearbooks. He was also issued bad checks from the defendant's personal account to cover the cost of the outstanding bill. He notified the school principal of the issue, and the bill of $6543 was later paid by a new regime of the PTA from Granbery School.

An employee of NBC Bank testified that the defendant opened three accounts on June 27, 2002, in the name of the Granbery PTA. She testified that on April 10, 2003, employees of the bank became suspicious when a check in excess of $1,000, drawn on a closed account with First Tennessee Bank, was discovered in the Granbery account. The employee testified that the bank froze the Granbery accounts and the defendant's personal accounts because of the suspicious activity and notified the school principal.

Lisa Ellis testified that she was a family friend of Tyler Doughty because her son and Tyler had been soccer teammates. She said that she wanted to organize a fund raiser for Tyler's family when he was diagnosed with a brain tumor. She explained that the defendant had talked with Mr.

Doughty about the possibility of organizing a fund raiser through Granbery School. She testified that she arranged for items, autographed by country music stars, to be auctioned on eBay to raise more money than they would in an in-person auction, in addition to having a cake walk and taking other donations. She estimated that they raised about $6800, and, shortly after the fundraiser, she was pressured by the defendant to turn the money over to her for placement in an account. Because she was bothered by the pressure, she opened a separate account for the family, and they received all of the money that she had raised. She testified that the Doughty family was in bad financial condition because of the cost of traveling to Memphis for treatment and the need to be with their child prevented them from working. Mr. Doughty confided to Ms. Ellis that they did not have the money to pay for Tyler's burial. Ms. Ellis said that her son asked if he could withdraw the money he had in his college savings account to help with Tyler's funeral expenses and that he, in fact, did so.

Mr. Doughty testified that he was the father of Tyler Doughty. He said that the defendant approached him about organizing a PTA fundraiser to ease some of the financial hardships his family was experiencing as a result of Tyler's medical problems. He testified that he was self-employed in construction and that he was unable to work during the time his son was receiving treatment at St. Jude Children's Research Hospital in Memphis. He said that he had known the defendant through her involvement at the school and trusted her when she approached him about raising money to assist his family.

The defendant told Mr. Doughty that they collected $900 at the fundraiser, and he believed her until three individuals told him they had given donations totaling $700. The three people told him that the defendant was taking donations in buckets and that the buckets were "overflowing with cash and checks." He then became concerned about the defendant's truthfulness with him regarding the donations. The defendant also organized a radio-thon for Mr. Doughty's son, which occurred before the news broke about her dealings with the PTA money. He spoke with the defendant after he heard the news, and she wanted to know if he still trusted her. He told her he was not sure, and she told him the radio fundraiser had generated around $9800, but she was going to send the money back. He said he did not receive any money from the radio-thon. He did receive some of the money from other funds that the defendant collected, but he had to repeatedly ask for the money before the defendant turned the money over to him.

A friend of the defendant's daughter testified that she had been invited to parties at the defendant's home where alcohol was served to underage guests. She also testified that the defendant took extravagant trips and included her children and several of her children's friends. She also testified that Tyler Doughty was her nephew and that she stopped socializing with the defendant after she learned of the thefts from Tyler's fund.

An audit manager with the comptroller's office in the Division of Municipal Audit testified that he was involved in the investigation of funds missing from Granbery School. He said that the defendant explained that she took the money to cover her son's medical bills and that she intended to repay the money. He testified that she told him that she had lost a bank deposit of approximately $25,000 in cash at her house and that she thought she threw the money away. The defendant

provided him with copies of cancelled checks that she claimed were written to offset the stolen money. He testified that the defendant took approximately $75,000 between 2002 and 2003. His audit reflected that the entire amount the defendant owed the school was $140,000.

Next, a separate auditor with the Comptroller Division of Municipal Audit testified that he had been asked to audit the misappropriations from the Granbery PTA and that he discovered a total of 111 forgeries in the name of Ann McKinney. He testified that the defendant altered checks payable to Apple Computer and faxed the forgery as proof of payment for school computers. When Apple contacted the school principal about the bill, the defendant assured her that it had been paid and provided the principal with a copy of a canceled check. The principal faxed a copy of the canceled check to Apple but was informed that the company had received the actual check and that it was not the same as the doctored one that the principal had faxed.

An employee in the risk-management division of Mid-South Kroger testified about fraudulent receipts from an August 2003 transaction that the defendant used to alter other receipts. The original receipt amount was for a $500 payroll check drawn on the Granbery School PTO account.

The defendant's second husband testified that the defendant was convicted in federal court of bank fraud during their marriage and was sentenced to probation. He said that the defendant's behavior changed after their son was involved in an auto accident in December 1999 and after her father died in January 2001. He testified that the defendant began to spend a great deal of time out of the house at night and on weekends "running around," drinking, and partying. He said that this behavior led to their divorce in 2005. He denied going on lavish vacations and said that he left all their personal banking to the defendant.

The defendant's ex-husband did not recall telling the defendant's psychiatrist about her bizarre behavior and said he would have remembered asking a doctor to intervene in his wife's life. He testified that he did not remember his wife buying thirteen Christmas trees in 2002.

The defendant's psychiatrist testified that he began treating the defendant for psychiatric and psychological problems in October 2006 and that he diagnosed her with bipolar disorder and facets of multiple personality disorder and obsessiveness. He said that the defendant did not tell him about her pending charges.

The defendant read a statement of allocution at the close of her proof. The defendant claimed that she did not receive any financial benefit from the missing money.

Following the defendant's statement, the State called the defendant's former physician to testify. He testified that the character letter submitted to the trial court on the defendant's behalf was a forgery and that he did not write or sign the letter.

After initially taking the matter of sentencing under advisement, the court subsequently sentenced the defendant to an effective term of fifteen years in the Department of Correction. In

doing so, the court applied five enhancement factors. One of the factors applied by the trial court was that the defendant had a prior criminal history of convictions and criminal behavior based upon her prior criminal conviction in federal court and that she had committed over one hundred forgeries for which she was not charged during her two-year criminal endeavor. The court considered as mitigating evidence that the defendant's crimes did not cause or threaten bodily injury. The court also considered that the defendant tried to compensate for the damages she caused by returning approximately $160,000 or $170,000 to the PTA accounts but did not afford it much weight because the deposits were an effort to cover up her criminal activities. The court also rejected the defendant's argument that she was remorseful because her statement of allocution did not reflect genuine remorse.

The trial court addressed the statutory considerations for alternative sentencing and found that she was not entitled to alternative sentencing. The court specifically noted that the defendant submitted fabricated medical records and a forged character reference from a doctor. Further, the court found that the defendant's taking of money from the Doughty fund was especially damaging and stated that outright alternative sentencing would be perpetrating a fraud on the public.

**Analysis**

On appeal, the defendant argues that the trial court erred in three areas: (1) enhancing her sentence based on facts neither admitted nor proven to a jury; (2) imposing consecutive sentences; and (3) application of mitigating factors. Initially, we note that the offenses for which the defendant was convicted occurred between 2000 and 2003. However, she was not sentenced until February 16, 2007. Effective June 7, 2005, the Sentencing Act was amended in response to *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). In the Compiler's Notes section to this amendment, it states:

> Acts 2005, ch. 353, § 18 provided that the act shall apply to sentencing for criminal offenses committed on or after June 7, 2005. Offenses committed prior to June 7, 2005, shall be governed by prior law, which shall apply in all respects. However, for defendants who are sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, the defendant may elect to be sentenced under the provisions of the act by executing a waiver of such defendant's ex post facto protections. Upon executing such a waiver, all provisions of the act shall apply to the defendant.

T.C.A. § 40-35-210 (Supp. 2005), Compiler's Notes. In the instant case, the defendant did not execute a waiver of her *ex post facto* provisions. Thus, the 2005 amendment to Tennessee Code Annotated section 40-35-210 does not apply to the defendant. Therefore, we review the trial court's imposition of the sentences in this case pursuant to the former act, as modified by *State v. Gomez*, 239 S.W.3d 711 (Tenn. 2007) ("*Gomez II*").

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. *See* T.C.A. § 40-35-401 (2003), Sentencing Comm'n

Cmts. When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). When conducting a *de novo* review of a sentence, we must consider: (1) any evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancement factors; (6) any statements made by the defendant on his or her own behalf; and (7) the potential for rehabilitation or treatment. T.C.A. § 40-35-210 (2003); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

## I. Application of Enhancement Factors

First, the defendant argues that the trial court erred by applying enhancement factors other than that of a prior criminal history in light of *Blakely*. We note that the defendant did object to the application of enhancement factors, other than prior criminal history, at the sentencing hearing.

Under the law as it existed before the 2005 amendment, unless enhancement factors were present, the presumptive sentence to be imposed was the minimum sentence within the range for a Class B or D felony. T.C.A. § 40-35-210(c). As the defendant was sentenced as a Range I offender, the appropriate sentencing range for the Class B felony was eight to twelve years and for the Class D felony was two to four years. T.C.A. § 40-35-112(b)(2), (4) (2003). Tennessee's pre-2005 sentencing act provided that the trial court was to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210 at (d), (e). If a trial court determined that a statutory enhancement factor applied, then the court had the authority to increase the presumptive sentence up to the maximum within the range. *Id.* at (d). Moreover, the weight the trial court afforded to any applicable enhancement factor was left to the trial court's discretion. *Id.*, Sentencing Comm'n Cmts.

The Tennessee Supreme Court, however, recently held that a trial court's enhancement of a defendant's sentence based on factors that had not been found by a jury beyond a reasonable doubt violated the defendant's Sixth Amendment right to a jury trial as interpreted by the United States Supreme Court. *Gomez*, 239 S.W.3d at 740 ("*Gomez II*") (citing *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 860 (2007)); *see also Blakely*, 542 U.S. at 301, 124 S. Ct. at 2536 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000)) ("'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'") In this case, the trial court relied upon five enhancement factors in setting the sentences imposed. Specifically, the court applied factors: (1) a previous history of criminal convictions or criminal behavior; (3) that the

offense involved more than one victim; (6) that the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great; (7) that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; and (14) that the defendant abused a position of private trust. T.C.A. § 40-35-114(1) (3), (6), (7), and (14) (2003). Under the dictates of *Gomez II*, application of these enhancement factors, other than prior criminal history, was constitutional error.[1]

The defendant does not contest the application of factor (1), and we agree it was appropriately applied based upon the defendant's prior conviction in federal court, as well as the separate acts of forgery which the defendant admitted to but was not charged with. Nonetheless, based upon the erroneous application of four enhancement factors, we conclude that the sentences imposed must be vacated and remanded for a sentencing hearing consistent with the holding in *Gomez II*.

## II. Consecutive Sentencing

Next, the defendant argues that the trial court erred in imposing consecutive sentencing. First, she contends that the imposition of consecutive sentencing violated the holding in *Blakely*. She further argues that the trial court erred in finding consecutive sentencing appropriate because her criminal activity "simply was not extensive."

A trial court's discretion to run sentences consecutively derives from Tennessee Code Annotated section 40-35-115(b). The statute provides, in relevant part, that a trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that the "defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2) (2003). The trial court explained the basis for ordering consecutive sentencing as follows:

> [T]he court does find that the offender has a record of criminal activity which is extensive. The fact alone in this case is that there [were] nine counts, and the case law clearly supports that you can rely on the counts that are before the court to establish an extensive criminal history, also establish that it has gone over a two-year period of time. I've also addressed the fact during that two-year period of time we have at least 111 forgeries, and all forgeries are felonies. So, she has committed at least 111 felonies, not including your money laundering. We know of at least four, but how many . . . money laundering acts were committed? I quit counting them as I was going through the financial records, but it was more than four. So there is no question that - - and her criminal activities continued on since her arrest, which I've already addressed. This Court finds that her criminal activity is extensive . . .

---

[1] In fairness to the trial court, at the time of the sentencing hearing in this case, *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) ("*Gomez I*") was the controlling law. In *Gomez I*, our supreme court held that the pre-2005 sentencing act, as written, did not violate the holding in *Blakely*. Our supreme court's decision in *Gomez II*, overruling *Gomez I*, was not released until October 9, 2007, well after the sentencing in this case.

In the consolidated appeal of *State v. Anthony Allen and State v. Eric Lumpkin*, Nos. W2006-01080-SC-R11-CD and W2005-02805-SC-R11-CD (Tenn., June 24, 2008), the Tennessee Supreme Court stated that a decision whether to impose consecutive sentences for multiple crimes is a decision about the manner in which a defendant serves his or her multiple punishments and is, therefore, akin to a trial court's decision as to where and how a defendant serves his sentences. The court thus concluded that a trial court's determination that an offender's record of criminal activity is extensive, pursuant to Tennessee Code Annotated section 40-35-115(b)(2), does not raise Sixth Amendment concerns. As such, the defendant's contention to the contrary is without merit. Moreover, we are unable to agree with the defendant that her record of criminal activity is "simply not excessive." Based upon the record before us, we find no abuse of discretion in the trial court's finding that the defendant had an extensive criminal history based both upon her prior conviction and the unindicted offenses committed in this case.

## III. Mitigating Factors

Next, the defendant argues that the trial court erred in rejecting the proposed mitigating factor that the defendant was suffering from a mental condition which significantly reduced her culpability. According to the defendant, it was "unreasonable for the sentencing court to acknowledge that a mental disorder exists and yet dismiss mitigation simply because the court could not identify the precise medical disorder." The trial court made the following findings:

> The Court does not deny that [the defendant] may suffer from some type of mental condition. . . . [However,] I don't think and I do not find and I don't think the evidence supports that [the defendant] suffers from a bipolar condition. . . . Most of the doctors who opined that she did suffer from a bipolar condition relied on a medical history that was provided by [the defendant], and quite frankly, I don't find that the medical history she provided to these doctors has any basis in fact. I have scrutinized those medical records significantly over the weekend and the reality of it is, what she was telling these doctors just did not occur. . . . In fact, . . . that whole two-page report, medical report or summary, whatever you want to call it, the Court finds was a total fabrication that [the defendant] created herself.

From this, we glean that the court concluded that the only evidence that the defendant suffered from a bipolar disorder was a forged medical history. After review, we find no error and conclude that the record supports the trial court's decision not to apply this mitigating factor.

The defendant also contends that the trial court erred in the weight given to the mitigating factor that the crime did not involve bodily injury. However, the weight afforded to an applicable mitigating factor is left to the trial court's discretion. T.C.A. § 40-35-210(d). After review, we find no abuse of discretion in the weight given to the factor as to the trial court considered the principles of sentencing and enunciated its reasoning on the record.

-11-

**Conclusion**

Based on the foregoing and the record as a whole, the case is remanded for re-sentencing.

_____
JOHN EVERETT WILLIAMS, JUDGE